UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>v.                                      )<br>                                              )<br>AARON MILEUR                  )<br>                                              )<br>       Defendant.                  )<br>_____) | No. 21-cr-248-01 (RDM) |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Aaron Mileur hereby submits the following memorandum in aid of sentencing in this matter. Mr. Mileur respectfully requests that this Honorable Court follow the recommendation of U.S. Probation and sentence him to a period of probation. Given that Mr. Mileur has been under supervision for nearly two years without a single violation, counsel recommends one year of probation.

Mr. Mileur is a forty-three year old man who resides in Wasilla, Alaska. He served in the United States Air Force for four years and was honorably discharged as an Airman 1st Class. He has no criminal record and is and has been gainfully employed since then. For the past seven years, he has maintained the same job at Denali Rain Gutters. His boss describes Mr. Mileur as a "good person" who "means well." Beyond that, he works up to 12 hours a day for 5 to 6 days per week. Exhibit A. He has not once violated a condition of release.

It was a series of unfortunate events that led to Aaron Mileur's involvement in January 6th. In the week leading up to January 6th, Mr. Mileur decided to escape from the cold of Alaska and went to Cancun, Mexico. He decided to see his cousin,

1

Ms. Carrie Ann Williams on his way back. He had not seen her in twenty years and didn't know when he was going to be back on this side of the continent so he decided to fly to Baltimore on his way back to Alaska.

The rally at the mall was an added benefit for Mr. Mileur. As a man from Alaska, he was excited to hear President Trump speak – national politicians did not campaign in Alaska and he believed it would be his last opportunity. But while he was excited, it wasn't a particular priority. That became clearer by late morning – they were still in Baltimore and the rally was supposedly coming to a close.

Mr. Mileur and his cousin and her fiancée decided to go anyway. Ms. Williams and Mr. McFadden had never been to D.C. and wanted to see sights. So the three took a train to Union Station.

At Union Station, they ate lunch. But Ms. Williams hurt her leg when she came off of the train and they all decided that it would be too painful for her if they went sightseeing. They had lunch and then left Union Station where a large screen was broadcasting the Trump speech outside. They joined to watch when someone came up to them and said that President Trump was to speak at the Capitol building and that it was only two blocks away.

Ms. Williams limped the two blocks and they walked up the east stairs and joined a gathering crowd. The crowd surged into the building and no police were visible. They walked around the building for no more than 5 minutes before leaving, even while unsure whether the police were actively ejecting people from the

building.  They waited outside as Ms. Williams rested her foot and then made their way back towards Union Station.

Mr. Mileur fully recognizes that he made poor choices and that January 6th was a big mistake.  Like many of those who came to Washington D.C. on January 6th, Mr. Mileur was anticipating nothing more than a rally with speakers talking about the stolen election.  But even that was not such a priority for him – he was spending time with his cousin and Baltimore, which was the primary goal for the day.  This was not about politics and certainly not about insurrection for these three.  They approached a gathering crowd, found themselves inside the Capitol and then left almost immediately without prompting.

It is true that Mr. Mileur heard bangs and saw tear gas both inside and outside of the building.  He has thus accepted responsibility for being somewhere he was not allowed to be.  But he accepted responsibility for Parading, and like many other misdemeanants, he accepted responsibility for Parading but is being publicly shamed for Sedition.  Given the public response, Mr. Mileur was concerned about the consequences of having pictures posted on his Facebook page.

On  December 21, 2022, Mr. Mileur pleaded guilty to Parading, Demonstrating or Picketing in a Capitol Building, in violation of 40 U.S.C. §5104(e)(2)(G).  The defense agrees with U.S. Probation's assessment that a probationary sentence is appropriate.  Based on all of the factors discussed below, Mr. Mileur respectfully requests that the Court impose a sentence of probation and that he complete community service.

**BACKGROUND**

At approximately 2:45 pm on January 6, 2020, Mr. Mileur stood with a crowd that had gathered outside of the East side of the Capitol. As the doors opened, the crowd lunged in and Mr. Mileur and the others moved into the building. They wandered about, trying to determine whether the police were allowing individuals to enter. When they could not get a proper answer, they left. Mr. Mileur accepts responsibility for his actions because he recognizes that he was not supposed to be on Capitol grounds, much less inside of the building. And in hindsight, he recognizes that the possibility that the police were allowing individuals to come inside was perhaps wishful thinking. But it is important to note that the scene around the Capitol when approaching from the East side was very different from the violent chaos on the West Terrace at the time he arrived. And Mr. Mileur spent no more than five minutes inside the building, never left the Rotunda and returned out to the East Terrace on his own.

Mr. Mileur spoke to the FBI voluntarily and consented to a search of his phone, providing the passcode. To the FBI, he described his surprise at the scene he encountered: "There was no way they're gonna let – let people do this stuff. Honestly it was just kinda like I can't believe this is happening. I really couldn't – it was and it wasn't something I even went there to do." Mr. Mileur later described "rioters" who were "aggressively" trying to destroy property. He then saw riot police and directed them: "'hey you guys need to get up there and get in like there'" and they were just totally ignoring us."

Mr. Mileur immediately recognized that there were individuals who had a very different idea of what they were doing there and he attempted to distance himself, explaining: "Um- but- there were people, there were kinda like agitators in the crowd. They were trying to approach you like, 'hey, we want you to make some noise.' And they grabbed the gate, and I'm just like- um no that's not me, I'm just here waiting. And some people were kinda being derogatory towards the officers, and stuff. Again, that's not something I usually see on the--the social media. And I wasn't for that at all."

For Mr. Mileur, they were not "storming the Capitol" and just a few weeks after January 6th, he was still processing how everything happened: "Um- but um- and then- just like when we walked in, there was the same officer there with his hands up like that- we walked out, and uh- yeah that's pretty much the extent of it. It was like- this was- that was just stupidity….Yeah- there was- there was no rhyme or reason to it. It- I never thought that that was gonna even happen- when we left Baltimore that morning, no. Never- I was like, go there, listen to Trump- and by the time people clear out, they have these little bicycle- um taxi things."

As the government described, Mr. Mileur did see assaultive conduct on a police officer – but it was nothing like the violent and scary assaults that we have all come to learned were occurring, especially on the West Terrace. Mr. Mileur described the one violent act that he saw:

> Q: Did you see any violent activity? Did you witness anything?

5

> A: I saw like- when we were at the base of the steps- um I did see one guy um dressed in all black- except he didn't have a helmet on or anything as a younger kid- probably like 18 or early 20s. Kind of jaw length, blonde curly hair, short guy, he had like a wooden dowel. Like something you would take out of your closet with your clothes on. And he jumped over and like- they have riot cops there and he hit one and then he had this look of surprise on his face. There was a gap between the agitators and the protestors. I guess if I can define the two - And so he reached over the um shields and hit the officer and then he just dropped it and ran.

Mr. Mileur's spontaneous decision to enter Capitol grounds was criminal but he had no plans to go inside the Capitol or even to the Capitol prior to the time he did. He went to the Capitol because he missed the rally and was told Donald Trump would be present. Amongst the January 6th participants, he spent among the briefest amounts of time inside and did not venture beyond the Rotunda. He witnessed a single assault, which seemed isolated at the time, where the assailant ran away. And he consented to a search of his phone and volunteered his passcode. And while there was discussion about whether videos and photos were deleted, he did not instruct anyone to delete anything, even when his cousin said she wanted to leave the photos on her Facebook page.

## ARGUMENT

### I. Legal Standard

The Court is well aware that the Supreme Court's opinions in *Kimbrough v. United* States, 552 U.S. 84 (2007), and *Gall v. United States*, 552 U.S. 38 (2007), have dramatically altered the law of federal sentencing. Congress has required federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. §3553(a). Those factors include (a) the nature and circumstances of the offense and history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory guideline range; (d) the need to avoid unwanted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational and vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. §3553(a).

## II.     Imposing a Sentence of Probation is Sufficient, But Not Greater Than Necessary, to Comply with 18.U.S.C. §3553(a).

The Defense concurs with U.S. Probation Office's recommendation of a period of probation but contends that a period of one year is appropriate.

It is certainly true that January 6th left a stain on the Republic. But Mr. Mileur, in the end, committed a trespassing offense and should be sentenced as such. The government points out that amongst trespassing offenses, it is among the most serious, but this is true of all of the nearly 900 defendants charged in these cases. Mr. Mileur's conduct fit the offense of a petty misdemeanor. And while we

7

have heard many times that the investigation into this case is unprecedented, the same sentencing factors that apply in any other trespassing case apply here. Mr. Mileur accepted responsibility for his actions and has shown almost immediate and genuine remorse. He has been entirely compliant on pretrial release and has done everything that has been asked of him. He has reflected on his actions from that day and recognizes the mistake that he made. Mr. Mileur should be sentenced as a misdemeanant who has a sparse criminal record who has taken responsibility for her actions and has been compliant. Accordingly, he should be ordered to serve a period of probation.

In fact, in applying the rubric cited by the U.S. Attorney's Office, it is clear that Mr. Mileur is at the low end of the spectrum for any of the prosecuted offenses. In each of its Sentencing Memoranda, the government has forcefully argued:

> Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

See ECF 70 at 17.

Applying these factors demonstrates that Mr. Mileur should receive a probationary sentence. He entered the Capitol building on the East side, far from

the violence that was occurring on the West at the time. He entered through a door that had not been breached with destroyed property and did so in a swell of people moving forward; he did not encourage violence or property destruction and was not in the near vicinity of property destruction (though he noted seeing some individuals doing so, he was "not there for that at all" and did not cheer them on); he did not destroy evidence; he was inside the building for five minutes and did not leave the Rotunda; he cooperated with commands from law enforcement and even attempted to direct them and provide water; and he is remorseful and accepts responsibility for his actions.

### a. Mr. Mileur's Personal History and Characteristics

Aaron Mileur is a veteran of the Air Force and has a reputation of being easy to get along with. He works hard and is the primary employee for a small company. Recently, he was able to purchase his first home. He has never been convicted of a criminal offense.

Mr. Mileur also spends much of his limited free time working with older veterans on a volunteer basis. He also helps outside of AMVETS by using his skills in construction to help those less fortunate. He even helped one veteran make his house handicapped accessible.

In his statement, Mr. Mileur told law enforcement that a main reason he wanted to go to the Trump rally was because his cousin, Ms. Williams believed that "Trump people were a bunch of racists" and his "goal was to bring her there and how her 'no they're not' they're actually pretty nice people and so there was her

going there was to – we hadn't seen each other in over 20 years and … trying to show her like 'hey all the stuff you're seeing is not that bad, it's not what you think it is."

These cases have demonstrated that both Mr. Mileur and Ms. Williams were correct. That amongst the crowd, there were definitely racists and there were likely people who were not racist. But what is striking about Mr. Mileur and Ms. Williams is that in a time that is so starkly partisan, they tried to find common ground. They were family who loved each other notwithstanding politics and they were willing to keep an open mind, despite being Alaska and Baltimore City – worlds apart geographically and culturally.

Mr. Mileur has returned to his law abiding life and has not had a single violation while on pretrial for two years. He primarily has his work and his anxious to move past the day that he has long called his "D.C. mistake."

### b. Nature and Circumstances of the Offense

Although Mr. Mileur has taken responsibility for illegally entering the Capitol building, there are a number of reasons why this factor weighs in favor of a sentence short of incarceration. Mr. Mileur had no plans to go to the Capitol. He did not engage in any violence or destruction that day. He did not dress prepared for violence. He did not confront any police officers. He did not go into any restricted areas and instead stayed in one room. He did not encourage anyone to do anything. Even among those who were guilty of the parading offense, his five minutes lies in the far end of the spectrum in terms of culpability.

### c. The Need to Promote Respect for the Law, Provide Just Punishment, Protect the Community and Provide Adequate Deterrence, and the Need to Avoid Unwanted Sentencing Disparities

Based on Mr. Mileur's personal history and characteristics, it is clear that his entry on January 6, 2021 was an isolated event that was completely out character. It is also extremely unlikely that he will recidivate given his lack of criminal history and his perfect record on pre-trial supervision for the past two years. Any potential for recidivism can be addressed by the probationary sentence recommended by the defense and U.S. Probation.

The government recommends a period of home incarceration, primarily because he witnessed an assault but still entered the building. The government's proposal is harsh within the context of his actions. While there were hundreds of assaults occurring, many at the same time, the assault Mr. Mileur saw was isolated, quick and without context. In addition, his entry into the building was without aggression or even effort.

When weighed against other cases, Mr. Mileur's conduct is more suitable for a sentence that spares him of incarceration. The government's recommendation recognizes this but believes he must be sentenced to home detention even though Mr. Mileur's conduct was, relative to others, minor.

The vast majority of individuals who have pleaded guilty to the Parading offense like Mr. Mileur has been spared incarceration. There have been some outlier sentences for individuals who appeared to seek out offices belonging to those

in Congressional leadership but, in an effort to avoid disparate sentences, judges in this District have followed the cues presented by the petty misdemeanor charge.

It is important to note that individuals allowed to plead guilty to parading include those whose conduct was significantly worse than Mr. Mileur. For example, Derek Jancart, 21-cr-148 (JEB) and Eric Rau, 21-cr-467 (JEB) wore gas masks, had two-way radios, Kevlar-lined gloves and were posting about the lack of snipers near the Capitol. *United States v. Derek Jancart*, 21-cr-148, ECF 25 at 13. Nichols Perretta entered after being tear gassed, stole Congressional documents and discarded them to destroy evidence. *United States v. Nichols Perretta*, 21-cr-539 (TSC), ECF 47 at 19. Nolan Kidd entered the building after being tear-gassed three times and shouted encouragements to rioters assaulting police. *United States v. Nolan Kidd*, 21-cr-249 (CRC), ECF 56 at 23. John Lolos was in the Capitol for 43 minutes "chanting at U.S. Capitol police" and was removed from a commercial flight on his way home for disrupting the flight with chants about Trump. *United States v. John Lolos*, 21-cr-243 (APM), ECF 32 at 2-3. Zachary Wilson, who received a probationary sentence, entered into Speaker Pelosi's office and twice lied to the FBI. *United States v. Zachary Wilson*, 21-cr-578 (APM), ECF 49 at 19. Andrew Ericson also went entered the Speaker's suite, stole a beer and drank it with his feet on the conference table. *United States v. Andrew Ericson*, 21-cr-506 (TNM), ECF 37 at 2.[1]

The government's request for a period of home detention appears to focus primarily on three allegations: 1) that Mr. Mileur observed violence; 2) that he

---

[1] The other cases relied upon by the government are either probationary sentences that support the same result here or are for charges more serious than the petty misdemeanor involved in this case.

celebrated his actions on Facebook; and 3) that he decided to delete records from Facebook and his phone. As discussed, the conduct that Mr. Mileur observed was assaultive but relatively fleeting. And in contrast to most January 6th defendants, Mr. Mileur did not brag about "storming" the Capitol or any accomplishment – he simply posted videos without comment. And while Mr. Mileur quickly removed those videos, individuals like him were mired in a damned-if-you-do/damned-if-you-don't scenario. Individuals who left alone such postings (also inviting comments often incendiary) were accused of stoking the flames in January 6th's aftermath. Those who did are accused of destroying evidence. Mr. Mileur did not intend to destroy evidence against him and even told the FBI that he knew his turn was coming. And there is absolutely no evidence that Mr. Mileur "deleted records" from his phone. He simply changed phones and was cooperative with the FBI about the information that he believed was in his cloud.

Some defendants charged even under 1752(a), the one year misdemeanor, have received sentences of straight probation. Rachel Pert was sentenced to probation despite admitting that she was trying to "storm them to stop the vote." *United States v. Rachel Pert¸* 21-cr-139 (TNM). Jeffrey Witcher was sentenced to probation despite "penetrat[ing] the Crypt portion of the U.S. Capitol, where violence between rioters and law enforcement was occurring around him" and deleting evidence from his phone, *United States v. Jeffrey Witcher¸* 21-cr-235 (RC), ECF 39 at 2. Kevin Cordon received probation despite entering the Capitol wearing body armor and a gas mask, *United States v. Kevin Cordon*, 21-cr-277 (TNM).

13

Verden Nalley received probation despite spending 30 to 40 minutes in the Capitol and threatening to "be back with guns in two weeks", *United States v. Verden Nalleyi,* 21-cr-116 (DLF) ECF 93 at 2.  Jenny Cudd received probation despite wearing bulletproof sweatshirt, pushed against police yelling "go" and "charge," *United States v. Jenny Cudd*, 21-cr-68 (TNM) ECF 90 at 2.

To summarize, a probationary sentence is appropriate for Mr. Mileur because no aggravating circumstances apply here.  Mr. Mileur was not in the District to stop the certification, he did not assault anyone, he did not encourage violence or property destruction, he was not part of the initial breach, he stayed in the building for minimal time, he engaged with the officers in a friendly manner, he did not destroy evidence and he did not go to a sensitive area when he was inside a building. He has been entirely compliant on pretrial release. He is sincerely remorseful.

## **CONCLUSION**

For the reasons stated above, Mr. Mileur respectfully requests that the Court impose a period of probation and complete a period of community service.  Mr. Mileur also requests that a fine not be imposed in light of his indigent status and his obligation to pay $500 restitution.

                                          Respectfully submitted,

                                          A.J. KRAMER
                                          FEDERAL PUBLIC DEFENDER

                        /s/
Eugene Ohm
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Eugene_ohm@fd.org