UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 21-CR-248 (RDM) |
| | : | |
| AARON MILEUR, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
MOTION TO MODIFY CONDITIONS OF PROBATION**

The UNITED STATES OF AMERICA, by and through its undersigned counsel, hereby opposes defendant Aaron Mileur's motion to modify the conditions of probation imposed at the sentencing hearing on March 20, 2023. Defendant's Motion to Modify Conditions of Probation ("Motion"), Dkt. 101. Because his request is unsupported by any demonstrated need, and because the condition imposed serves the important statutory sentencing purpose of protecting the public, Mr. Mileur's request to "possess, at home, a firearm" to protect against "potential moose on his property[,]" Motion at 1, 3, should be denied.

FACTUAL BACKGROUND

A.   Mr. Mileur

Defendant Aaron Mileur lives in Wasilla, the fourth-largest city in Alaska. His home, as reported to the U.S. Probation Office, *see* PSR, Dkt. 88, at 2, is in a suburban neighborhood about four miles from the heart of Wasilla. That area is a thriving business district that is home to Fred Meyer superstore, Target, Walmart Supercenter, Sportsman's Warehouse, Carr's grocery store, Home Depot, Lowe's Home Improvement, a number of car dealerships, a movie theater, Planet Fitness and a host of other gyms, dozens of restaurants, at least two microbreweries, coffee shops,

fast food, and many other conveniences.  Mr. Mileur's home is about a mile and a half from Larson Elementary School, which is adjacent to Teeland Middle School and the Mat-Su Career & Tech High School.  In short, he lives in one of the more densely-populated and thriving parts of the state of Alaska, within a typical American neighborhood.

### B. Moose

Moose, the largest members of the deer family, live in nearly all corners of Alaska.  Residents and visitors delight in the frequent moose-peeping opportunities across the state.  Many residents, including the undersigned, consider a visiting backyard moose to be a pleasurable diversion; a cause to pull out a camera and boast to friends and neighbors when a particularly majestic specimen appears.  Bulls with impressive antlers and young calves in the springtime are highlights of many an active neighborhood "critter watch" group on social media.  Neighborhood moose are known to park themselves in a favored nap spot for hours at a time, greatly enhancing the excitement of a day of telework.

And one need not keep to the woods to enjoy communing with moose.  According to the Alaska Department of Fish and Game, "[p]eople and moose have been neighbors for thousands of years."[1]  Moose are known to wander the bustling streets of downtown Anchorage.  At nearly this exact time last year, two moose visited the United States Courthouse, munching fresh twigs and entertaining the office workers at the federal building.

---

[1] https://www.adfg.alaska.gov/index.cfm?adfg=livewith.moose.



*Two moose outside the federal courthouse at 9:34 am, March 15, 2022*

The pair snacked leisurely for at least a few hours, unbothered by the cars that passed or the occasional ogling pedestrians.



*Same two moose, having hardly moved, at 11:55 am, March 15, 2022*

Perhaps precisely because moose are such passive, quiet, and intriguing creatures with a tendency to keep still, on occasion people can be drawn too close for comfort. Like any wild animal, moose can pose a danger, particularly when they are harassed, or when startled or fearful for the safety of their young. A mamma moose with a young calf is a well-known hazard, and Alaskans are taught at a young age to give these normally docile pairs plenty of space. *See Mirror Lake Middle School Moose Safety Video*, available at https://www.adfg.alaska.gov/index.cfm?

adfg=livewith.moose (encouraging kids, among other things, to refrain from throwing snowballs at schoolyard moose). But according to the Alaska Department of Fish and Game (ADF&G), even kids are usually safe around moose.[2] If a moose is obstructing the way, ADF&G suggests that a person should simply "be patient" and wait for the moose to move along. To protect against an aggressive moose, ADF&G advises people to keep a safe distance, or to run away. *Id.* They do *not* advise people to shoot at an angry moose.

C. **Shooting Moose**

Shooting moose is not a common and accepted method for protecting against the rare display of moose aggression. The city of Wasilla prohibits the discharge of any firearm within the city limits. Wasilla Municipal Code ("WMC") 9.12.010(A). The code provides an exception for "lawfully defending persons or property," but, of course, such exceptions must be "lawful." WMC 9.12.020(B). Moreover, the shooting of moose in particular is heavily regulated as part of Alaska's treasured hunting tradition. "Moose are the most sought after big game animal in Alaska[,]" and the harvest of these animals is regulated by location, method, and quantity, among many other rules and regulations (including the use of the harvest and the characteristics of the animal, such as antler length). *See* ADF&G resource "Moose Hunting in Alaska," available at https://www.adfg.alaska.gov/index.cfm?adfg=moosehunting.moremoose. Any shooting (known as a "taking" or "harvest") of a game animal must be permitted and reported to ADF&G within prescribed time periods. Under Alaska law, a game animal such as a moose can be taken in defense of life or property, but only after "all other practicable means to protect life and property are exhausted[.]" 5 Alaska Admin. Code (AAC) § 92.410(a)(3). The "property" that may be protected by taking a moose or other game animal includes a person's home, car, domesticated animal, or

---

[2] https://www.adfg.alaska.gov/index.cfm%3Fadfg%3Dlivewith.aggressivemoose.

other property "of substantial value necessary for the livelihood or survival of the owner." *Id.* § 92.410(c)(4). If the animal is shot in defense of life or property, it immediately becomes the property of the state, and it is required that the shooter salvage the meat and antlers and surrender it to ADF&G, as well as report the taking and disclose the circumstances. *Id.* § 92.410(b).

Incidents of moose shootings in defense of life or property are difficult to find, very likely because they are rare.[3] In 2013, a Fairbanks area man, Michael Baldwin, shot a moose in his yard to protect his dog. *See State of Alaska vs. Baldwin,* Case No. 4FA-13-01155CR (May 2, 2013). He did not report the shooting, and was therefore arrested and charged with wanton waste of big game, taking a moose during closed season, unlawful possession of game, and hunting without a valid license. He pled guilty to the lead charge of wanton waste of big game, in violation of 5 AAC § 85.045(A)(13), in 2014. *Id.*; *see Alaska Public Media* reporting, available at https://alaskapublic.org/2013/04/26/ester-man-faces-charges-after-killing-moose-in-yard/. In 1990, a Talkeetna man, David Jurco, shot a moose which had charged him in his yard. He immediately reported the shooting to the authorities, who arrived at his home and asked him to gut the animal. Jurco refused, but he did drag the carcass to the road so that it could be picked up by officials. For his refusal to gut the animal himself, Jurco was arrested and charged with violating 5 AAC § 92.410(b). A jury convicted him, and he was sentenced to a suspended jail sentence. *Jurco v. State*, 816 P.2d 913, 914 (Alaska Ct. App. 1991). On appeal, the Alaska Court of Appeals found that the requirement that the shooter "salvage" the meat and surrender it to the authorities did not require Jurco, under the specific circumstances of his case, to butcher the meat, since he

---

[3] On March 31, 2023, the government requested records from ADF&G of game (specifically, moose) taken in defense of life or property, and the location where the taking occurred, which as noted must be reported pursuant to 5 AAC § 92.410(b)(2) and (3). At this time, a response is awaited.

did take the required steps to ensure it was delivered to the authorities "in edible condition." *Id.* at 915. Other than these two cases—spanning more than thirty years—undersigned counsel has found no reports of Alaskans shooting moose in their yard to protect life or property.

ARGUMENT

In seeking to modify his conditions of release to allow him to keep a firearm at home to defend against moose, defendant Aaron Mileur points to general information about moose dangers and notes that a moose appeared in his yard. Motion at 1-2. He does not claim that the moose he spotted was itself aggressive (nor to the photos, showing the moose nuzzling against a tree, suggest any danger). Motion at 2. And he does not cite any instance in which he has felt the need to arm himself in defense of a moose in the 25 years he has lived in Alaska. *Id.*; *see also* PSR at ¶41 (noting that Mr. Mileur has lived in the state since 1998). Indeed, Mr. Mileur does not even directly claim that that his answer to this Court's inquiry at the sentencing hearing—that he did not need his firearm for self-defense or defense of property—was incorrect. Now, through counsel, he asserts only that "upon reflection" he would like permission to possess his rifle for this purpose.[4] His request should be denied.

This Court may impose a firearms restriction as a condition of probation. 18 U.S.C. §3563(b)(8). As the U.S. Probation Office described, "[r]emoval of firearms and other dangerous weapons from a person under supervision serves the statutory sentencing purpose of public

---

[4] Mr. Mileur does not raise any other grounds for objection to this condition, including any arguments under the Second Amendment. But any such argument would fail, because this Court is well within its statutory and Constitutional authority to restrict a defendant's access to firearms during the period of his probationary sentence. *See District of Columbia v. Heller*, 554 U.S. 570, 626 (2008) (noting that "the right secured by the Second Amendment is not unlimited," and it does not protect a right "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."); *cf. New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156 (2022) (repeatedly stating that the amendment protects the rights of "law-abiding" citizens).

protection, 18 USC § 3553(a)(2)(C), by allowing the probation officer to supervise the defendant without risk to safety caused by the possession of weapons." PSR at ¶66 n.2. This condition makes sense in this case. Restricted access to firearms is reasonably necessary to ensure the safety of the public, which includes the probation officers supervising Mr. Mileur during the limited time of his probation. The presence of a firearm in Mr. Mileur's home during the completion of his federal sentence creates a heightened risk to the safety of probation officers, which this condition mitigates. Mr. Mileur has provided no reason for the Court to conclude that the risk of "potential moose on his property[,]" Motion at 3, should be given greater consideration than the well-established need to maintain the safety of the community and the probation officers charged with protecting us all.[5]

      Finally, the proposed order Mr. Mileur submitted is not well-tailored to his request. In the event the Court is inclined to grant the defense motion, the government requests that the proposed order be tailored to address the sole concern he has raised: "to possess, *at home*, a firearm" to "defend himself and his property against potential moose *on his property*." Motion at 1, 3 (emphasis added). Mr. Mileur has raised no argument, or even speculation, to support an order that would allow him to possess a firearm outside his home.

---

[5] Government counsel discussed this request with representatives from U.S. Probation on April 4, 2023. It is expected that the Probation Officer will prepare a written statement to the Court separate from this filing. It is undersigned counsel's understanding that the Probation Office will oppose the modification.

## CONCLUSION

For the foregoing reasons, the Court should deny defendant Aaron Mileur's request to modify his conditions of release.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

*/s/ Emily W. Allen*
EMILY W. ALLEN, Cal. Bar No. 234961
Assistant United States Attorney
601 D. Street, N.W.
Washington, DC 20530
emily.allen@usdoj.gov